## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS, SPRINGFIELD DIVISION

| | | |
|---|---|---|
| GINA R. EDMONDSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 20-cv-3284 |
| | ) | |
| KILOLO KIJAKAZI, | ) | |
| Acting Commissioner | ) | |
| of Social Security[1] | ) | |
| | ) | |
| Defendant. | ) | |

## <u>REPORT AND RECOMMENTATION</u>

TOM SCHANZLE-HASKINS, U.S. MAGISTRATE JUDGE:

Plaintiff Gina R. Edmondson appeals from the denial of her application for Social Security Disability Insurance Benefits (Disability Benefits) under Title II of the Social Security Act.  42 U.S.C. §§ 416(i) and 423.  This appeal is brought pursuant to 42 U.S.C. § 405(g).  Edmondson filed Plaintiff's Brief in Support of Motion for Summary Judgment (d/e 11).  The Defendant Commissioner filed a Motion for Summary Affirmance (d/e 15).  This matter is before the Court for a Report and Recommendation.  For the reasons set forth below, the Decision of the Commissioner should be AFFIRMED.

---

[1]The Court takes judicial notice that Kilolo Kijakazi is now Acting Commissioner of Social Security.  As such, she is automatically substituted in as the Defendant in this case.  Fed. R. Civ. P. 25(d).

## STATEMENT OF FACTS

### Background

Edmondson was born on December 30, 1966.  She secured a GED and has previously worked as a general cashier, deli counter worker, and cook helper.  She suffered from right elbow degenerative joint disease, asthma, and tinnitus.  She alleged that she became disabled on November 17, 2018 (Onset Date).  Certified Transcript of Proceedings before the Social Security Administration (d/e 8) (R.), 15, 17, 25, 39.

### Evidence Submitted Before the Administrative Hearing

On February 22, 2017, Edmondson saw advanced practice nurse Julie Barry, APN. [2]  Edmondson was divorced and working full time.  She exercised three times a week and her exercise included walking.  She reported that the ringing in her ears was worse and it interfered with her sleep.  She wore hearing aids most days, but not at the visit.  R. 355.  On examination, Edmondson was alert and oriented with normal mood and affect; she was in no acute distress; she had clear breath sounds to

---

[2] At the time of the examination, Edmondson's last name was Clark.  She married on February 28, 2018.  She started using the last name Edmondson shortly before the marriage.  See R. 474 (At a Monday February 26, 2018 office visit, Plaintiff used the name Edmondson but informed the doctor that she would be getting married on Wednesday, which would have been February 28, 2018.).  The Court uses the last name Edmondson throughout this Report and Recommendation.

auscultation and no cough; she had normal gait, muscle strength, and muscle tone.  R. 357.

On March 14, 2017, Edmondson saw audiologist Dr. Lauren Welch, Au.D., for tinnitus.  Edmondson reported that she consistently used her Widex RIC hearing aids but did not typically use the tinnitus signal program.  She denied experiencing any dizziness or vertigo.  On examination, Edmondson had mild to moderate hearing loss and the otoscopic examination was normal.  Dr. Welch said her word recognition was "excellent" at 96 percent correct on the right and 100 percent correct on the left.  Her hearing had not changed from previous tests.  The hearing aids were in good condition and were functioning properly.  R. 353.  Dr. Welch recommended tinnitus retraining therapy and referral to a tinnitus specialist.  R. 354.

On March 24, 2017, Edmondson saw advanced practice nurse Barry.  She was working full time and exercised three times a week.  Her exercising included walking.  She reported low back pain and sciatic nerve pain, but she did not have joint swelling.  She was not walking much except at work.  R. 348.  On examination, Edmondson was alert and oriented with normal mood and affect; she was in no acute distress; she was in no respiratory distress; her breath sounds were clear to auscultation and she

had no cough.  She had normal gait, normal muscle tone and strength, and a normal back examination.  R. 350.

On August 17, 2017, Edmondson saw advanced practice nurse Barry.  She was working full time and exercised three times a week.  Her exercise included walking.  She reported pain in her mid-back, which increased with activity.  She had no chest pain or breathing problems.  R. 343.  On examination, Edmondson was alert and oriented with normal mood and affect; she was in no respiratory distress with clear bilateral breath sounds; her thoracic spine was tender to palpation; her gait, muscle strength, and muscle tone were normal with no joint swelling.  R. 346.

On December 5, 2017, Edmondson saw advanced practice nurse Barry for a follow up.  She reported that she was working fulltime, but she had been off work for a couple of weeks due to right elbow pain.  She had injured her elbow in an accident when she was four years old.  The pain did not radiate up or down her arm and her health was good generally.  She exercised three times a week and her exercise included walking.  R. 372.  The record of this office visit did not contain examination notes.  Barry assessed asthma and prescribed albuterol in a nebulization solution.  Barry also ordered x-rays of Edmondson's elbow and referred Edmondson to otolaryngologist (ENT) Dr. Carol Bauer, M.D., for tinnitus.  R. 373-74.

On December 16, 2017, Edmondson had an MRI taken of her right elbow.  The MRI showed chronic posterior dislocation of the radial head with overlap of approximately three centimeters, and resultant hypoplasia of the radial head; a small elbow joint effusion; moderate chondromalacia of the ulnar trochlear articulation; and no acute fracture.  R. 740.

On December 20, 2017, Edmondson completed a Function Report— Adult form (2017 Function Report).  R. 229-36.  Edmondson lived in a house with her boyfriend and said she could not work because she was in constant pain from her elbow; her painful elbow limited her ability to lift.  In addition, her tinnitus diminished her ability to concentrate and remember.  She said she could not lift "anything," she could not concentrate, and she forgot "everything."  She also was always tired and slept "a lot."  R. 229.  When she had "bad days with tinnitus," she spent the day in bed.  The ringing in her ears also woke her up four to five times a night and she only slept about five hours each night.  R. 230.

Edmondson did not list problems performing her personal care, except she had trouble bathing because she had trouble reaching to wash herself.  She did not need reminders to care for herself or to take medicine.  She prepared her own meals, mostly frozen dinners and other simple items and stated she had no interest in cooking and could not concentrate to

cook bigger meals.  She performed the household chores of laundry, dusting, vacuuming, and washing dishes and rested after completing chores.  Her boyfriend helped with household chores.  Edmondson did not do any yardwork.  She went out once or twice a week by herself, and she drove.  She shopped for groceries once a month and she could pay bills, count change, and handle bank accounts.  R. 231-32.

Edmondson reported that she spent most of her time with her boyfriend.  She also visited with her son and her grandchildren once a week and had no problems getting along with others.  She otherwise did not engage in social activities.  R. 232-33.

Edmondson opined that her impairments affected her ability to lift, reach, hear, remember, complete tasks, concentrate, understand, follow instructions, and use her right hand and arm.  She said she could not lift or reach with her right hand.  She opined that she could walk for two miles without stopping and pay attention for 10 minutes.  She did not finish what she started.  She was pretty good at following written instructions and not good at all at following spoken instructions. She did not handle stress well and did not like changes in routine.  R. 234-35.

On January 15, 2018, Edmondson saw cardiology advanced practice nurse Rachana Adhikari, APN.  Edmondson reported that eight or nine

years earlier she was told she had a blockage in the right side of her neck and she wondered if the blockage was worse.  She reported that everything was foggy; she could not concentrate; she felt lightheaded at times; and she had had blurry vision for the last six months.  She also had epigastric discomfort and shortness of breath with exertion.  She reported that a couple times a week she had elevated blood pressure when she woke up which lasted for a couple of hours.  She was pretty active, but not lately.  She explained that the more she walked, the worse her tinnitus became.  R. 771.  On examination, Edmondson was alert, oriented, and not in any distress; her lungs were clear to auscultation; her heart rate and rhythm were normal with no murmurs; her extremities had no edema or cyanosis.  Adhhikari ordered an electrocardiogram, a stress echocardiogram, and an ultrasound of her carotid arteries.  R. 773.

On January 25, 2018, Edmondson underwent a sleep study.  The study showed no evidence of obstructive sleep apnea.  R. 445.

On February 1, 2018, Edmondson saw Dr. Carol Espejo, M.D., for evaluation of Edmondson's elbow and management of her elbow pain.  She reported pain in her elbow from her childhood injury and that the pain had worsened over the last several years and interfered with her ability to work.  She also reported weakness in her upper left extremity.   She rated

her pain at the best to be 5/10 and at worst to be 9/10.  She rated her pain at 6/10 during the office visit and that it was worse with movement.  She reported limitation of movement of her right forearm.  R. 430.  On examination, Edmonson was in no apparent distress; she could ambulate within normal limits; she had limited flexion and extension of her right elbow; her right elbow was tender to palpation.  The range of motion of the elbow was limited in supination but normal in extension.  Edmondson had normal strength in her right upper extremity with slightly weaker supinators and elbow extensors.  Her sensation and reflexes were normal.  R. 431-32. Dr. Espejo administered a steroid injection into Edmondson's right elbow. R. 432.

On February 5, 2018, Edmondson saw ENT specialist Dr. Bauer for hearing loss and tinnitus.  Edmondson was diagnosed with sensory hearing loss and tinnitus eight years earlier and was fitted with hearing aids.  She felt that the tinnitus worsened in the last two to three years and reported the tinnitus caused poor concentration, poor sleep, and anxiety.  She did not wear her newer hearing aids that she obtained three years earlier as she said the newer hearing aids amplified background noise when she was working and worsened her tinnitus.  Edmondson reported dizziness once a week for four to five years.  She denied vertigo but reported feeling foggy

headed and nausea.  She reported headaches that had worsened in the last six months.  R. 434.

On examination, a hearing test showed mild to moderate hearing loss with word recognition of 96 percent on the right and 100 percent on the left. Edmondson's ear canals and tympanic membranes were normal.  R. 435. Dr. Bauer assessed tinnitus and hearing loss and recommended referral to an audiologist for tinnitus retraining therapy.  Dr. Bauer also recommended cognitive behavioral therapy and noted that "Appropriately fitted hearing aids can help reduce tinnitus."  R. 436.

Dr. Bauer also wrote an undated letter after the February 5, 2018, office visit.  The body of Dr. Bauer's letter stated:

> To Whom It May Concern:
>
> Gina [Edmondson] was seen in my clinic on February 5, 2018 for evaluation of chronic tinnitus. The tinnitus has been present for eight years and is the result of bilateral hearing loss. She finds the tinnitus to be disabling and rated the severity of the tinnitus on the Tinnitus Handicap Inventory with a score of 100, indicating a severely bothersome problem.
>
> I have recommended that because of her severe inability to cope with the tinnitus, she undergo cognitive behavioral therapy and hearing aid fitting. In addition, her tinnitus is exacerbated with sound hypersensitivity related to her uncontrolled migraines. Because of these complications, she is unable to tolerate work environments due to the exacerbation of her sound sensitivity and tinnitus.

R. 471.

On February 6, 2018, Edmondson had a stress echocardiogram performed.  The test showed normal function with no evidence of exercised induced pain or ischemia.  R. 448.

On February 23, 2018, Edmondson saw state agency psychologist Dr. Frank Froman, Ed.D., for a mental status examination.  R. 453-56. Edmondson presented with a "flattened, affectless, and colorless manner." She could relate well; she spoke clearly with some lag between questions and answers; she maintained good eye contact; she reported that her tinnitus was getting worse.  Edmondson socialized with family.  She slept six to seven hours a night and took some naps.  She could do her own self-care and routine chores, but she had trouble dusting and vacuuming because of problems with her right arm.  R. 453-54.

On examination, she was oriented in good contact with reality.  She correctly added and subtracted but could not perform serial sevens. Memory tests showed a possibility of focus difficulties. Additional testing showed "confusion, easily getting lost, and not being sure at all what to do when she does get lost."  Dr. Froman identified "some beginning indicators of possible dementia, or indicators of lack of function and performance, possibly also related to depression."  Dr. Froman continued, "Whatever be

the case, it does seem clear that she would have difficulty 'keeping up' with the demands of a competitive work environment."  R. 455.

Dr. Froman diagnosed history of panic disorder, currently in remission; adjustment disorder with depressed mood; rule out beginnings of organicity.  Dr. Froman opined that Edmondson was able to perform her prior work as a home health care worker.  He stated, "

> She is able to understand oral and written instructions, although she may have difficulty retaining them.  She can manage benefits, get along with coworkers, and deal with the stress associated with customary employment as long as it does not tax her right arm.

R. 455-56.

On February 26, 2018, Edmondson saw Dr. Jeffrey Wells, D.O., to establish primary care.  She reported that she was right-handed and had a chronically dislocated right elbow due to an accident when she was four years old.  She also said that she had ringing in the ears for the last eight years.  She wore hearing aids and saw Dr. Bauer for her tinnitus.  R. 474-75.  On examination, Edmondson's lungs were clear to auscultation with no wheezes, rales, or rhonchi; her grip strength was 5/5 bilaterally, and her muscle strength in her extremities was 5/5; she had no focal sensory or motor deficits.  R. 475.

On March 2, 2018, Edmondson saw state agency physician Dr. Vittal Chapa, M.D., for a consultative examination.  R. 458-60.  Edmondson reported she was right-handed and experienced pain in her right elbow. She injured her elbow in an accident when she was four or five years old. She also had ringing in the ears and asthma.  Her asthma symptoms were fairly well controlled with medication.  R. 458-59.  On examination, Edmondson could hear a normally spoken voice; her external auditory canals were patent, and her tympanic membranes were intact; she could bear weight and ambulate without aids; her lungs were clear to auscultation.  She had no wheezing and no motor weakness or muscle atrophy.  Her pinprick sensation was intact.  She had no joint redness, heat, swelling, or thickening.  She had no paravertebral muscle spasms. Her right grip strength was 4/5 and her left was 5/5.  She could perform fine and gross manipulations with both hands.  Her lumbosacral spine flexion was normal.  Straight leg testing was negative.  She had slightly limited range of motion in her right elbow.  She had full range of motion in all other joints.  R. 459-60.

On March 12, 2018, Edmondson saw Dr. David Arndt, D.O., at an ambulatory care center complaining of exacerbation of asthma for a week. She reported being short of breath on ambulation and all activity.  She had

tried nebulizer and inhaler with no relief and requested a referral to a pulmonologist. R. 478-79. Dr. Arndt noted, "She is interested in referral to pulmonology for better asthma control, but she has not even seen her primary care physician for any asthma control whatsoever." R. 479. On examination, Edmondson was alert, oriented, and in no acute distress; her oxygen saturation level was 93 percent; she had an expiratory wheeze; she had no rales or rhonchi. A chest x-ray showed no acute infiltrates and she responded to medication. Dr. Arndt assessed acute asthma flare and told her to follow up with her primary care physician. R. 480.

On March 19, 2018, Edmondson saw Dr. Wells for asthma. Edmondson said she was not much better with her asthma. She wheezed at times and had tightness in her chest and could not do much because she was out of breath. Dr. Wells noted that the x-ray showed no acute disease. R. 483. On examination, her lungs were clear to auscultation with no wheezes, rales, or rhonchi; her grip strength was 5/5 bilaterally, and her strength in all her extremities was 5/5; she had no focal sensory or motor deficits. Dr. Wells prescribed Singulair in addition to her other medications. R. 484.

On May 15, 2018, state agency physician Dr. Richard Lee Smith, M.D., prepared a Physical Residual Functional Capacity Assessment of

Edmondson.  R. 78-81.  Dr. Smith opined that Edmondson could

occasionally lift 50 pounds and frequently lift 25 pounds; sit for six hours in

an eight-hour workday; stand and/or walk for six hours in an eight-hour

workday; frequently reaching with her right arm overhead and in front of her

on her right side; and avoid concentrated exposure to noise, fumes, odors,

dusts, gases, poor ventilation, and hazards.  R. 78-80.

On May 17, 2018, Edmondson saw Dr. Wells.  She reported

problems with thrush in her throat and shoulder pain from her right elbow

arthritis.  R. 505.  On examination, she had yeast on both sides of her

tongue; her lungs were clear to auscultation with no wheezes, rales, or

rhonchi; she had 5/5 grip strength and 5/5 strength in all her extremities;

she had no focal sensory or motor deficits.  Dr. Wells gave her medication

for the yeast infection and instructed Edmondson to rinse her mouth out

after using a steroid inhaler.  R. 506.

On June 1, 2018, Edmondson had x-rays taken of her right elbow.

The x-rays showed complete dislocation of the radial head relative to the

humerus with substantial deformity and osteoarthritis.  R. 710.

On June 5, 2018, Edmondson saw nurse practitioner Matthew Bruns,

NP, for left arm pain.  Bruns worked with orthopedic surgeon Dr. George

Crickard, M.D.  Edmondson reported having a chronically dislocated radial

head since she had an accident when she was four years old.  She reported neck, shoulder, and elbow pain, and numbness down into her fingers.  An EMG study showed carpal tunnel syndrome on the right.  Dr. Crickard had previously performed left carpal tunnel release surgery on Edmondson.  Prior x-rays showed chronically dislocated right radial head with minimal osteoarthritic changes.  R. 510-11.

On examination, Edmondson was oriented and alert with normal mood and affect.  Her range of motion about the right shoulder and wrist were "mostly unremarkable with no real limitation."  Bruns noted some mild discomfort with range of motion of the shoulder.  Edmondson's range of motion in her right elbow was limited.  Tinel's and Phalen's signs were positive at the right wrist.[3]  She had no erythema, edema, or ecchymosis about the right shoulder, elbow, or wrist. R. 512.

Bruns assessed right arm pain.  X-rays showed minimal degenerative changes without any acute osseous abnormality.  Bruns suspected that the majority of her discomfort came from right carpal tunnel syndrome.  Burns recommended physical therapy on the neck and shoulder and stated, "I certainly do not see any physical exam findings that would suggest that she

---

[3] Tinel's sign and Phalen's sign are maneuvers done with the hands and wrists to test for carpal tunnel syndrome.  See Dorland's Illustrated Medical Dictionary (32nd ed. 2012) (Dorland's), at 1714, 1716, 1896.

is disabled." R. 512. Bruns ordered physical therapy. Dr. Crickard co-signed Bruns' medical progress notes. R. 513.

On June 12, 2018, Edmondson saw physical therapist Zachary Kinscherf, DPT, for an initial evaluation for cervicalgia. Edmondson reported pain down her right arm related to her injured elbow. She was told she had a pinched nerve in her neck. She reported right shoulder and elbow pain, numbness and tingling in her right hand, and weakness in her right upper extremity. She also had pain in her neck, headaches, tinnitus, and lightheadedness. Edmondson reported that she was married, lived in a house, and did all her own shopping, cooking, and cleaning. She cared for her dogs as well. R. 529. The evaluation showed decreased range of motion in the right elbow with decreased extension and supination. R. 531.

On July 6, 2018, Edmondson completed another Function Report—Adult form (2018 Function Report). R. 255-62. Edmondson lived in a house with her family and reported she could not work because her tinnitus interfered with her ability to concentrate and remember. She also had panic attacks and could not work because of the injury to her right elbow. She could not grip with her right hand. R. 255.

Edmondson said in the 2018 Function Report that she usually got up, ate breakfast, and washed the dishes. She slept most of the day because

the ringing in her ears was so loud. She was not interested in doing anything and needed help putting on her pullover shirts and her bra. She experienced elbow and shoulder pain when she cared for her hair. She did not note any other difficulties with her personal care. She used a pill organizer to remember to take her medicines. R. 256-57.

Edmondson prepared TV dinners, but did not otherwise cook. She said she could not concentrate on cooking big meals. She washed dishes once a day and dusted once a week. She could not do yardwork due to her elbow so her husband did the yardwork. She drove and she could go out alone. She went grocery shopping two to three times a week. She could pay bills, count change, and handle bank accounts. R. 258. She visited with her grandchildren once every two weeks. She talked on the telephone with her children, mother, and sisters once or twice a week. She otherwise did not like to go out of the house. R. 259-60.

Edmondson said that her impairments limited her ability to lift, reach, hear, remember, complete tasks, concentrate, understand, follow instructions, and use her right hand. She said she could pay attention for 15 minutes and she did not follow written instructions well. She could follow spoken instructions as long as she could hear and understand what

was being said.  She got along with authority figures, but did not handle stress or changes in routine well.  R. 260-61.

On July 12, 2018, Edmondson was discharged from physical therapy. She only attended one physical therapy session after the initial evaluation and she admitted that she was not consistent with her home exercise program.  R. 534.  Edmondson told Kinscherf's office by phone that her doctor advised her to hold off on physical therapy for now.  R. 536.

On July 23, 2018, Edmondson saw audiologist Dr. Welch for a hearing aid check.  She had been wearing the hearing aids consistently for four months but did not wear the hearing aids consistently prior to that.  Dr. Welch checked the hearing aids and confirmed that they were working well. Dr. Welch reprogramed the hearing aids to decrease the overall gain in both and Edmondson was satisfied with the adjustment.  R. 542.

On July 27, 2018, state agency psychologist Dr. Melanie Nichols, Ph.D., prepared a Psychiatric Review Technique form for Edmondson.  Dr. Nichols assessed Edmondson with depressive, bipolar, and related disorders and anxiety and obsessive-compulsive disorders and found that Edmondson's mental impairments caused mild limitations on her functional abilities.  R. 94-95.

On August 3, 2018, state agency physician Dr. Marion Panepinto, M.D., prepared a Physical Residual Functional Capacity Assessment of Edmondson.  R. 97-100.  Dr. Panepinto opined that Edmondson could occasionally lift 50 pounds and frequently lift 25 pounds; sit for six hours in an eight-hour workday; stand and/or walk for six hours in an eight-hour workday; frequently reaching with her right arm in front, laterally, and overhead; and avoid concentrated exposure to noise, fumes, odors, dusts, gases, poor ventilation, and hazards.  R. 98-99.

On September 6, 2018, Edmondson had an x-ray taken of her right shoulder.  The x-ray showed mild degenerative changes and no definite evidence of an acute fracture or dislocation.  R. 750.

On November 7, 2018, Edmondson saw Dr. Wells.  Dr. Wells noted that Edmondson saw an orthopedic specialist for neuropathic pain arising from her right elbow condition.  The specialist told her that there was little they could do for her.  R. 648.  On examination, Edmondson's lungs were clear to auscultation with no wheezes, rales, or rhonchi; her grip strength was 5/5 bilaterally, and her muscle strength was 5/5 in all of her extremities; she had no focal sensory or motor deficits.  Dr. Wells gave Edmondson a flu shot and renewed her prescription.  R. 649.

On April 8, 2019, Edmondson had x-rays taken of her right wrist and forearm.  The x-rays showed mild degenerative changes in the wrist with no acute fracture; the forearm showed no acute fractures; the elbow showed a dislocation of the radial head with chronic deformity of the radial head.  The radiologist assessed persistent dislocation of the radial head with chronic deformity.  R. 713-14.

On April 22, 2019, Edmondson saw orthopedic surgeon Dr. Luke Harmer, M.D.  She reported that her elbow became more painful over the last four to five years and she stopped working as a cashier because of the elbow pain.  The pain radiated into her fingers and woke her up at night.  R. 688.  On examination, Edmondson was alert and oriented; she had normal motor function, normal reflexes, intact sensation; she could stand and ambulate; she had decreased range of motion in her right elbow. Edmondson had "subjectively altered sensation throughout all peripheral nerve distributions" without "any single peripheral nerve pattern." Froment's test was negative.[4]  Edmondson's left upper extremities and bilateral lower extremities were normal.  X-rays of the right elbow showed dislocation of the right radial head.  The radius was relatively longer in the

---

[4] Froment's test is a test for a lesion on the ulnar nerve by holding a sheet of paper between the thumb and index finger.  See Dorland's, at 1711.

ulna on the right.  Wrist x-rays were normal.  Dr. Harmer commented, "This patient is quite disabled by this elbow and her elbow pain."  He ordered additional imaging and a follow up examination in six weeks.  R. 688-89.

On April 25, 2019, Edmondson had a CT scan taken of her right upper extremity.  The scan showed chronic posterosuperior dislocation of the radial head, unchanged from the December 16, 2017 MRI; and mild ulnar trochlear osteoarthritis.  R. 718.

On May 8, 2019, Edmondson saw Dr. Wells.  Dr. Wells noted that Edmondson had some degenerative disc disease at C5-6 and C6-7 with mild cervical spinal stenosis and moderate bilateral neural foraminal stenosis.  R. 693.  On examination, Edmondson's lungs were clear to auscultation bilaterally with no wheezes, rales, or rhonchi; she had 5/5 grip strength bilaterally and 5/5 muscle strength in her extremities; she had no focal sensory or motor deficits.  Dr. Wells refilled her prescriptions. Edmondson declined a neurosurgical consult.  Dr. Wells recommended physical therapy and Edmondson told Dr. Wells that physical therapy did not help her in the past.  R. 694.

On July 11, 2019, Edmondson saw occupational therapist Shannon Foley, OT for an evaluation of her upper extremities.  R. 818.  Edmondson said she had pain in her right extremities for the last 10 years.  She

reported decreased range of motion and decreased strength in her right elbow and shoulder.  R. 818.  She had difficulties bathing, lifting, holding, and engaging in crafts/hobbies; she rated her pain at 5/10 at rest, 6/10 with use, and 9/10 shoulder pain at the worst.  Her hobbies and activities included walking two German shepherds and going to car shows.  R. 819.

On examination, Edmondson had no bruising, swelling, or scarring; she was tender to palpation at olecranon of ulna and supraspinatus; she had 4/5 flexion and extension in her right elbow and shoulder and 5/5 in the left shoulder and elbow; she had decreased grip strength on the right compared to the left; she had normal sensation to light touch.  R. 821-22.  Foley recommended therapy to increase range of motion and strength and set as one of the long-term goals to increase right grip strength by 10 pounds to improve ability to carry shopping bags.  R. 822-23.

On July 17, 2019, Edmondson saw advanced practice nurse Courtney Kruthoff, APN, for a preoperative physical examination before Edmondson's right planter fasciotomy operation.  She reported she used her rescue inhaler once a week and had no chest pain, chest pressure, or shortness of breath.  R. 833.  On examination, Edmondson was in no distress.  She had normal breath sounds with no wheezes or rales; she had normal range of motion with no edema or tenderness; she had normal

mood, affect, behavior, judgment, and thought content. Kruthoff also reviewed Edmondson's chest x-ray and EKG and determined that Edmondson was at low risk to proceed with the operation. Kruthoff stated that Edmondson's asthma was under good control. R. 835-36. The x-ray showed no acute cardiopulmonary abnormality. R. 888.

On July 30, 2019, Edmondson saw podiatrist Dr. Shwetal Patel, DPM, for a follow up of the performed right planter fasciotomy surgery. On August 6, 2019, Edmondson saw Dr. Patel for a post-operative follow up. Edmondson reported that she was doing "very well" and denied any chest pain or shortness of breath. On examination, Edmondson was healing well. R. 860.

On August 15, 2019, occupational therapist Foley discharged Edmondson from physical therapy. Edmondson attended only three of nine scheduled therapy sessions. R. 868-69.

On August 16, 2019, Edmondson saw Dr. Patel for a post-surgery follow up. She reported doing well and denied having any chest pain or shortness of breath. On examination, Edmondson was healing well. R. 872.

## The Evidentiary Hearing

On August 21, 2019, the Administrative Law Judge conducted an evidentiary hearing.  Edmondson appeared with her attorney.  Vocational expert Holly Berquist Neal also appeared by telephone.  R. 36.

Edmondson testified first.  She lived in a one-story home with her husband and an adult son who worked and cared for himself.  She had two grandchildren that were ages seven and eleven who visited Edmondson and sometimes slept over at her home.  She had a driver's license and a GED.  R. 38-39.  She was righthanded.  R. 44-45.

Edmondson last worked at Walmart in November 2017.  She said she left because she was unable to perform her duties as a cashier.  She could not lift due to pain in her elbow, and she had problems with her right-hand grip.  R. 40-41.  The pain from her elbow increased over time until eventually she could not work.  She could not lift cans or other objects at the check-out counter.  R. 42.  The cashier job also required her to lift heavy objects such as 50-pound bags of dog food.  R. 45.

She previously worked at a deli counter in a grocery store, but left that job and took the cashier job at Walmart because a new manager of the deli department required her to lift more.  R. 41-42.

Edmondson used heat and ice to help with the pain in her elbow and lower back and also took Celebrex and gabapentin.  She used heat and ice for pain about once a day for about an hour.  She lay in bed when she used heat and ice.  R. 43, 56-57.

Edmondson also had carpal tunnel syndrome in her right hand.  She would not agree to have carpal tunnel release surgery on her right wrist because she was afraid the surgery would make her condition worse.  She said that the doctors would not guarantee that the carpal tunnel surgery would make her condition better.  R. 46.

Edmondson had tingling and numbness in her right hand four to five times a week lasting for two hours each time.  She often lost grips on objects such as dishes and estimated that she dropped dishes seven times a week. R. 47.

Edmondson also had pain and stiffness in her right shoulder.  She said she had rotator cuff syndrome.  Her shoulder was "real achy," and she could not reach overhead at all.  Her shoulder bothered her four days a week for three hours out of the day.  The shoulder problem started after she quit working, about a year prior to the hearing.  The shoulder problem stayed the same during the last year.  R. 48-49.

Edmondson opined that she could lift four or five pounds with her right hand.  She needed both hands to lift a gallon of milk.  R. 48.  She could drive for 30 minutes but had to stop after 30 minutes because her lower back hurt too much.  She drove with only her left hand on the steering wheel and used her right hand to operate the gear shift.  R. 49-50.  She said that she could sit for 45 minutes before she needed to change positions.  Twisting her body or bending over caused pain in her lower back.  If she knelt or crouched, she would need something to grab onto to get back up.  R. 56.

Edmondson also said she could not work because of her tinnitus.  She had hearing aids for six years, but the hearing aids did not help.  She said they made things worse because, "they make the noise – everything so much louder that the ringing in the ears and the noise is horrible."  R. 43.

The ringing was worse at the time of the hearing.  Edmondson said that she had ringing in her ears every day and the ringing got louder three times a week.  The ringing interfered with her ability to carry on a conversation as she could not understand what people were saying.  R. 45-46.

Edmondson said she washed dishes for 10 to 15 minutes a day once a day and she needed a 15-minute break after washing dishes.  She could

not go back to washing dishes after the break, though, due to her elbow.

She said that about twice a week, she was not able to wash dishes

because the ringing in her ears was so bad.  She took care of her self-care

except she could not wash her back and had difficulty combing her hair.

Her husband did the cooking.  R. 44, 51-52.

Edmondson used to walk for exercise, but not with her plantar

fasciitis.  She had not walked for eight months due to her foot problems.  R.

44.  She just had surgery on her plantar fasciitis shortly before the hearing.

R. 59.

Edmondson had trouble sleeping because of the ringing in her ears.

She went to bed about 9:00 p.m., but did not fall asleep until sometimes

11:00 p.m.  The ringing also woke her up a couple of times a night and she

took an hour to go back to sleep after waking up.  R. 53.  Edmondson

stayed in bed during the day because, "My ears are loud and no

concentration."  She napped for about an hour a day at unplanned

intervals.  R. 55.

Edmondson said she also suffered from asthma.  Her asthma was

seasonal and symptoms could be triggered by proximity to agricultural

crops and extreme humidity.  She felt short of breath about two times a

week which lasted for 30 minutes.  She used a rescue inhaler at those

times.  She was worn out for an hour after an episode of shortness of

breath.  R. 54.

Vocational expert Neal then testified.  Edmondson had no objections

to Neal's qualifications to testify as a vocational expert witness.  R. 59-60.

The ALJ asked Neal the following hypothetical question:

> Q     Okay. For my first hypothetical please assume a
> hypothetical individual of the same age, education, and past
> work experience as the claimant. And please further assume
> that such an individual can work at a light exertional level as
> defined in the regulations with the following additional
> limitations.
>       The hypothetical individual is able to occasionally -- oh,
> I'm sorry -- can never climb ladders, ropes, or scaffolds; can
> occasionally reach overhead with the right upper extremity. And
> the hypothetical individual is able to frequently handle and
> finger with the bilateral upper extremities.
>       The hypothetical individual can occasionally be exposed
> to concentrated dusts, odors, gases, fumes, and poor
> ventilation; should avoid hazards such a (sic) unprotected
> heights and moving mechanical parts. And the hypothetical
> individual should avoid exposure to loud noise which is SCO
> Noise Level 4 intensity and above.  Could such an individual
> perform any of claimant's past work?

R. 61-62.[5]  Neal opined that the person in the hypothetical question could

not perform Edmondson's prior work as she performed them but could

perform the cashier job as it was generally performed in the national

economy.  Neal noted that the cashier job as generally performed was

---

[5] SCO is the Department of Labor's Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles, published as a supplement to the Department of Labor's Dictionary of Occupational Titles.

limited to frequent reaching in all directions, but in Neal's expert opinion the person could perform the cashier job as generally performed even if limited to occasional overhead reaching.  R. 62-63.

Neal also opined that the person in the hypothetical question could perform representative jobs that exist in the national economy, such as routing clerk with 655,590 such jobs in the national economy and marking clerk with 2,056,030 such jobs in the national economy.  Neal initially opined that the person could perform the job of small product assembler, but then stated that the person could not perform that job.  R. 63.

Neal opined that if the person in the hypothetical question was limited to occasional fingering and handling with the right hand, the person could perform the job of furniture rental clerk, but no other job.  If the person was limited to no overhead reaching with the right hand, she could not work.  If the person needed extra unscheduled breaks, was off task more than 10 percent of the workday, absent more than one day a month she could not work.  R. 63-66.

At the end of the hearing, the ALJ requested updated information on Edmondson's plantar fasciitis surgery.  Her attorney agreed to submit the records.  The hearing then concluded.  R. 67.

Evidence of Office Visit after the Hearing

On August 30, 2019, Edmondson saw Dr. Patel for a post-surgery follow up.  She was doing well and she denied any chest pain or shortness of breath.  On examination, the incision was completely healed.  R. 876.

THE DECISION OF THE ALJ

On December 4, 2019, the ALJ issued her decision.  The ALJ followed the five-step analysis set forth in Social Security Administration Regulations (Analysis).  20 C.F.R. §§ 404.1520, 416.920.  Step 1 requires that the claimant not be currently engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(b), 416.920(b).  If true, Step 2 requires the claimant to have a severe impairment.  20 C.F.R. §§ 404.1520(c), 416.920(c).  If true, Step 3 requires a determination of whether the claimant is so severely impaired that she is disabled regardless of her age, education, and work experience.  20 C.F.R. §§ 404.1520(d), 416.920(d).  To meet this requirement at Step 3, the claimant's condition must meet or be equal to the criteria of one of the impairments specified in 20 C.F.R. Part 404 Subpart P, Appendix 1 (Listing).  20 C.F.R. §§ 404.1520(d), 416.920(d).  If the claimant is not so severely impaired, the ALJ proceeds to Step 4 of the Analysis.

Step 4 requires the claimant not to be able to return to her prior work considering her age, education, work experience, and Residual Functional Capacity (RFC).  20 C.F.R. §§ 404.1520(e) and (f), 416.920(e) and (f).  If the claimant cannot return to her prior work, then Step 5 requires a determination of whether the claimant is disabled considering her RFC, age, education, and past work experience.  20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g), 416.960(c).  The claimant has the burden of presenting evidence and proving the issues on the first four steps.  The Commissioner has the burden at Step 5 to present evidence that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy.  20 C.F.R. §§ 404.1512, 404.1560(c); Weatherbee v. Astrue, 649 F.3d 565, 569 (7th Cir. 2011); Briscoe ex rel. Taylor v. Barnhart, 425 F.3d 345, 352 (7th Cir. 2005).

The ALJ found that Edmondson met her burden at Steps 1 and 2. She had not engaged in substantial gainful activity since the Onset Date, and she suffered from the severe impairments of right elbow degenerative joint disease, asthma, and tinnitus.  R. 17.  The ALJ found at Step 3 that Edmondson's impairments or combination of impairments did not meet or equal a Listing.  R. 19.

Before reaching Step 4, the ALJ found that Edmondson had the following RFC:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except never climb ladders, ropes, or scaffolds; occasionally reach overhead with the right upper extremity; frequently handle and finger with the bilateral upper extremities; occasional exposure to concentrated dusts, odors, gases, fumes, and poor ventilation; should avoid hazards such as unprotected heights and moving mechanical parts; avoid exposure to loud noise at Selected Characteristics of Occupations (SCO) noise level 4 intensity and above.

R. 19-20.  The ALJ relied on Dr. Chapa's consultative examination that showed lungs clear to auscultation, no motor weakness or muscle atrophy, intact sensation in the lower extremities, full range of motion in all extremities except the right elbow, and the ability to perform fine and gross manipulations.  The ALJ also relied on the numerous medical examinations that showed lungs clear to auscultation, normal strength in all extremities, normal or near normal grip strength, no motor or sensory deficits, and no shortness of breath.  The ALJ also relied on evidence that Edmondson did not consistently wear her hearing aids and Dr. Bauer's statement in the examination notes that properly fitted hearing aids can help reduce tinnitus. The ALJ also relied on the fact that Dr. Welch adjusted Edmondson's

hearing aids on July 23, 2018, and Edmondson was satisfied with the adjustment.  R. 20-21, 24.

The ALJ also relied on imaging that showed Edmondson's elbow problem was a long-standing impairment that had not interfered with her ability to work in the past.  The ALJ also relied on the examination by nurse practitioner Bruns that showed generally good strength in her right upper extremity and normal range of motion except in the right elbow.  The ALJ also relied on the fact that Edmondson did not complete recommended physical therapy. R. 21-22.

The ALJ also relied on Edmondson's reports in various examination notes, including the notes of therapists Kinscherf and Foley, that she walked regularly; did all her own shopping, cooking, and cleaning; took care of her dogs and walked them; and went to car shows.  R. 22-23.  The ALJ noted that Edmondson stated in one or both of her Function Reports that she could perform a majority of her personal care; prepared simple meals; did laundry, dusting, vacuuming, and washing dishes; went out twice a week, drove, and went out alone; shopped in stores two to three times a month; visited her grandchildren; and could walk two miles without resting.  The ALJ also noted that when asked by the Function Report form, Edmondson did not indicate that her impairments affected her ability to

stand, squat, bend, walk, sit, kneel, climb stairs, or use her left hand.  R. 23.

The ALJ also relied on the opinions of psychologists Drs. Nichols and Froman that her mental impairments would not limit her from engaging in work.  The ALJ did not find persuasive Dr. Froman's opinion that Edmondson could perform her prior work as a home health care worker because the opinion was a statement on an issue reserved to the Commissioner.  R. 23.

The ALJ found that the opinion of nurse practitioner Bruns that Edmondson was not disabled was not persuasive because the opinion touched on the issue of disability which is reserved to the Commissioner. The ALJ, however, also found that Bruns' opinion could be persuasive to the extent it was consistent with the other evidence in the record and with Edmondson's activities of daily living.  R. 24.

The ALJ found Dr. Panepinto's opinions were somewhat persuasive. The ALJ, though, imposed additional limitations on the RFC based on Edmondson's testimony and evidence about her activities of daily living. The ALJ limited Edmondson to light work instead of medium work and limited Edmondson to occasional overhead reaching.  R. 24.

The ALJ found that Dr. Bauer's opinion in her April 2018 letter was not persuasive because the issue of disability is reserved to the Commissioner, the opinion was based on Edmondson's subjective report that she found "the tinnitus to be disabling," and the opinion was based on a single examination. In addition, the ALJ noted that Edmondson admitted to Dr. Bauer that she had not been wearing her hearing aids. R. 24.

The ALJ also found that Dr. Harmer's opinion that Edmondson was quite disabled by her elbow and elbow pain was not persuasive because it touched on a matter reserved to the Commissioner. R. 24.

The ALJ also found that Edmondson's testimony about her symptoms was not consistent with the other evidence in the record. Her statements were not consistent with her reports of her activities of daily living to her medical providers and in her Function Report. The ALJ noted in particular that Edmondson testified that she had shortness of breath twice a week, but she told Dr. Patel shortly before and after the hearing that she did not have any shortness of breath. R. 21-23.

The ALJ then found at Step 4 that Edmondson could perform her prior work as a cashier as the job is generally performed in the national economy. The ALJ relied on the opinion of vocational expert Neal. R. 25.

The ALJ continued to Step 5 in the Analysis.  The ALJ found that Edmondson could perform a significant number of jobs that exist in the national economy.  The ALJ relied on the Medical-Vocational Guidelines, 20- C.F.R. part 404, Subpart P, Appendix 2, and the opinions of vocational expert Neal that a person with Edmondson's age, education, work experience, and RFC could perform the representative jobs of routing clerk and small product assembler.  R. 26.  The ALJ concluded that Edmondson was not disabled.

Edmondson appealed the ALJ's decision.  On August 31, 2020, the Social Security Administration Appeals Council denied Edmondson's request for review.  The decision of the ALJ then became the final decision of the Defendant Acting Commissioner.  R. 1.  Edmondson then filed this action for judicial review.

## ANALYSIS

This Court reviews the Decision of the Commissioner to determine whether it is supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate" to support the decision.  Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the findings if they are supported by substantial evidence and may not substitute its judgment or reweigh the evidence.

Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003); Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986). This Court will not review the ALJ's evaluation of statements regarding the intensity, persistence, and limiting effect of symptoms unless the evaluation is patently wrong and lacks any explanation or support in the record. See Pepper v. Colvin, 712 F.3d 351, 367 (7th Cir. 2014); Elder v. Astrue, 529 F.3d 408, 413-14 (7th Cir. 2008); SSR 16-3p, 2017 WL 5180304, at *1 (October 25, 2017) (The Social Security Administration no longer uses the term credibility in the evaluation of statements regarding symptoms). The ALJ must articulate at least minimally her analysis of all relevant evidence. Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ must "build an accurate and logical bridge from the evidence to her conclusion." Clifford v. Apfel, 227 F.3d 863, 872 (7th Cir. 2000).

The decision is supported by substantial evidence. The medical evidence from Dr. Chapa's examination generally, the repeated examinations by Dr. Wells that found full strength, and the examination by nurse practitioner Bruns all supported the ALJ's RFC determination. Dr. Bauer's statement in the treatment note that properly fitted hearing aids can help reduce tinnitus, combined with Dr. Welch's note that she readjusted

Edmondson's hearing aids to Edmondson's satisfaction, supported the ALJ's findings that she could work if she wore properly fitted hearing aids.

Substantial evidence also supported the ALJ's finding that Edmondson's testimony about her symptoms was inconsistent with her prior statements. The finding was supported by Edmondson's statements to Kinscherf that she did all the cooking, shopping, and cleaning, and cared for her dogs; and her statements to Foley that she walked her dogs and went to car shows; her repeated statements to Dr. Patel both before and after the evidentiary hearing that she had no shortness of breath; and her Function Reports in which she described engaging in more activity than she described in her testimony.

Substantial evidence also supported the ALJ's consideration of opinion evidence. The ALJ properly discounted all of the opinions that Edmondson was or was not disabled because that issue is reserved by regulations to the Commissioner. 20 C.F.R. § 404.1520b(c)(3). The ALJ also correctly noted that Dr. Bauer only saw Edmondson once and based much of her opinion on Edmondson's self-report of the severity of her symptoms. The ALJ also was entitled to note that the opinion was inconsistent with Dr. Bauer's statement in the treatment note that properly fitted hearing aids could help reduce tinnitus.

The ALJ's finding at Step 4 was supported by the RFC and the opinion of vocational expert Neal.  The claimant at Step 4 must show that she could not perform her past relevant work either as she actually performed it or as the job is generally performed in the national economy. 20 C.F.R. §§ 404.1452(f) and 404.1560(b)(2); SSR 82-61; see Smith v. Barnhart, 388 F.32d 251, 253 (7th Cir. 2004).  Neal opined that a person with Edmondson's age, education, work experience, and RFC could perform her past relevant work as a cashier as the job was generally performed.  Neal's opinion and the RFC provided substantial evidence for the finding.

Neal's opinion also provided substantial evidence to support the ALJ's decision at Step 5.  Neal opined that a person with Edmondson's age, education, work experience, and RFC could perform the representative job of routing clerk with 655,590 such jobs in the national economy.  This opinion supported the ALJ's Step 5 conclusion.  The decision was supported by substantial evidence.

Edmondson argues that the ALJ erred when she stated that the RFC determination was more restrictive than Dr. Panepinto's opinions.  The ALJ's RFC was more restrictive in limiting Edmondson to occasional overhead reaching with the right hand, but the RFC was less restrictive in

that the ALJ's RFC did not limit reaching in other directions, but Dr. Panepinto limited Edmondson to frequent reaching in front, laterally, and overhead.  The Court agrees that the ALJ overstated that the RFC determination was more restrictive.  The error, however, was harmless because the error would not change the outcome.  See Butler v. Kijakazi, 4 F.4th 498, 504 (7th Cir. 2021) ("As we have repeatedly held, the harmless error standard applies to judicial review of administrative decisions, and 'we will not remand a case to the ALJ for further specification where we are convinced that the ALJ will reach the same result'") (quoting McKinzey v. Astrue, 641 F.3d 884, 892 (7th Cir. 2011).  The jobs identified at Step 5 by Neal were limited to frequent reaching in all directions.  R. 63.  Thus, if the ALJ adopted Dr. Panepinto's reaching limitations on remand, the outcome would be the same.

Edmondson also argued that the ALJ erred when she said that Edmondson could perform the small product assembler job.  The Court agrees this was error.  Neal initially opined that the person in the hypothetical question could perform the small product assembler job, but then withdrew that opinion.  The ALJ erroneously stated that Edmondson could perform the small product assembler job.  The ALJ's error was harmless.  At Step 5, the Commissioner must present evidence that the

claimant could perform a significant number of jobs that existed in the national economy.  Here, the ALJ also found that Edmondson could perform the representative job of routing clerk. Neal opined that 655,590 routing clerk jobs existed in the national economy.  This number of jobs meet the Commissioner's burden at Step 5 to show that Edmondson could perform a significant number of jobs in the national economy.  See Liskowitz v. Astrue, 559 F.3d 736, 743 (7th Cir. 2009) ("[I]t appears to be well established that 1,000 jobs are a significant number of jobs" for purposes of Step 5 of the Analysis).  The Commissioner thus met his burden even if the ALJ made this error.  The error did not affect the outcome, and so, was harmless.

Edmondson also argues that the ALJ said that he found Dr. Froman's opinions persuasive but ignored Dr. Froman's statement that Edmondson "would have difficulty 'keeping up' with the demands of a competitive work environment."  R. 455.  Dr. Froman, however, stated in his conclusion Edmondson could "understand oral and written instructions, although she may have difficulty retaining them" and she could "deal with the stress associated with customary employment as long as it does not tax her right arm."  R. 456.  The ALJ's finding was consistent with Dr. Froman's statements in his conclusion.  In light of Dr. Froman's conclusion, the Court

will not reverse to require the ALJ to discuss the other statement in the body of the report cited by Edmondson.  Reversing to require the ALJ to amplify her consideration of Dr. Froman's report would not change the outcome of this case.  Any error, therefore, was harmless.

Edmondson complains that the ALJ did not rely on Dr. Harmer's opinion that she was "quite disabled" by her elbow.  The Court finds no error.  The ALJ discounted Dr. Harmer's opinion that Edmondson was disabled because the determination of the ultimate question of disability is reserved to the Commissioner.  The ALJ was correct on this point.  20 C.F.R. § 404.1520b(c)(3).

Edmondson argues that he ALJ failed to consider the evidence about her asthma.  The Court disagrees.  The ALJ is not required to cite to every piece of evidence.  See Pepper v. Colvin, 712 F.3d 351, 363 (7th Cir. 2013).  The ALJ repeatedly noted that, with one or two exceptions, healthcare providers consistently found that Edmondson's breathing was clear to auscultation without wheezes, rales, or rhonchi.  The ALJ also cited chest x-rays that showed her lungs to be clear.  Finally, the ALJ considered Edmondson's repeated reports to Dr. Patel that she did not have any shortness of breath before and after the evidentiary hearing.  The ALJ

amply considered the evidence on the limiting effects Edmondson's asthma.  There was no error.

Edmondson argues that the ALJ erred in her consideration of Edmondson's statements about the effects of her symptoms.  The Court again disagrees.  As discussed above, the ALJ noted the inconsistencies in Edmondson's testimony compared to her statements to medical providers and in the Function Reports.   The ALJ also explained the lack of medical evidence to support her testimony of limiting effect of her symptoms.   The ALJ could properly discount Edmondson's statement when her statements were not supported by the other evidence in the record.

> [I]f an individual's statements about the intensity, persistence, and limiting effects of symptoms are inconsistent with the objective medical evidence and the other evidence, we will determine that the individual's symptoms are less likely to reduce his or her capacities to perform work-related activities....

SSR 16-3p, 2017 WL 5180304, at *8.  The ALJ adequately explained the basis for her treatment of Edmondson's testimony about her symptoms.

Edmondson argues that the ALJ improperly equated Edmondson's activities of daily living with the ability to perform full time work.  The Court disagrees.  The ALJ considered Edmondson's activities of daily living along with the other evidence in the record.  The regulations required her to do

so.  20 C.F.R. § 404.1529(c)(3)(i).  The ALJ did not equate Edmondson's activities with the ability to engage in full-time employment.

THEREFORE, THIS COURT RECOMMENDS that the Defendant Commissioner's Motion for Summary Affirmance (d/e 15) should be ALLOWED; Plaintiff Gina Edmondson's Brief in Support of Motion for Summary Judgment (d/e 11), should be DENIED; and the decision of the Commissioner should be AFFIRMED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk of the Court within fourteen days after service of a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2).  Failure to file a timely objection will constitute a waiver of objections on appeal.  See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).  See Local Rule 72.2.

ENTER:   January 11, 2022

_____s/_Tom Schanzle-Haskins_____
TOM SCHANZLE-HASKINS
UNITED STATES MAGISTRATE JUDGE